UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
UNITED STATES OF AMERICA


         - against -                                 17 Cr. 00628 (JPO)


JOHN FARCHIONE

                    Defendant.
-------------------------------------------------------X


---

### APPLICATION FOR MODIFICATION OF SENTENCE
### PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)
### AS A RESULT OF COVID-19

---

Elizabeth E. Macedonio, Esq.
40 Fulton Street - 23rd Floor
New York, New York 10038
Office 212-235-5494
Cell 917-533-5965
Fax 212-480-4444
elizabeth@macedoniolaw.com


Carla Sanderson, Esq.
260 Madison Avenue, 22nd Floor
New York, New York 10016
T 646.499.3818
F 646.499.3814
Carla@carlasandersonlaw.com

# I.

## Preliminary Statement

Currently, COVID-19 is tearing through the nation's prisons and jails and as of April 22, 2020 has already killed 24 people incarcerated in the federal Bureau of Prisons ("BOP") system and has left an unknown number sick and hospitalized.[1] In light of the danger posed by COVID-19 John Farchione ("Mr. Farchione") submits the instant application under 18 U.S.C. § 3582(c)(1)(A)(i) to request that the Court reduce his sentence to enable him to serve the remainder of his sentence on home confinement.

Mr. Farchione, age 67, is incarcerated at Federal Medical Center Devens ("Devens"), an administrative security federal medical center, due to his health problems. He is serving an 84 month sentence imposed by Your Honor on February 15, 2019. As explained herein, Mr. Farchione's numerous health problems make him particularly susceptible to severe complications and death if he is infected with COVID-19. Moreover, at Devens, Mr. Farchione cannot engage in meaningful social distancing to protect himself and others. Due to the extraordinary circumstances whereby Mr. Farchione will be exposed to the dangers of COVID-19, we respectfully request that the Court issue an Order pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) so that he may be immediately placed on home confinement to serve the remainder of his sentence. In the alternative, we request that the Court grant Mr. Farchione a 180 day Furlough pursuant to 18 U.S.C. § 3622.  It may literally save his life, and others.

---

[1] *See* BOP Press Releases at https://www.bop.gov/resources/press_releases.jsp

## II.

### Facts

On February 15, 2019, Your Honor sentenced Mr. Farchione to a term of 84 months imprisonment for his conviction of fraud and other economic offenses. Mr. Farchione has been incarcerated since April 22, 2019. During the year that he has been incarcerated Mr. Farchione has been a model inmate. He has reduced his "base points" to zero and has a "custody score" of 19. The combination of a base score reduction and this outstanding custody score has made him eligible for transfer to the camp at Devens that houses minimum-security inmates. Mr. Farchione has been approved to be transferred to the camp and upon information and belief his transfer is happening imminently. Mr. Farchione has actively participated in the programs offered at Devens and has already completed 14 education courses. He has no disciplinary infractions and assists other inmates including but not limited to those who do not know how to read and those who are new to the facility.

Mr. Farchione is almost 68 years old and according to the Center for Disease Control ("C.D.C") he is high-risk for severe COVID-19 complications. The C.D.C. stated criteria for those at high-risk include being over 65 years old, having diabetes, hypertension, heart problems, chronic bronchitis, emphysema, heart failure, blood disorders, chronic kidney disease, chronic liver disease, any condition or treatment that weakens the immune response, current or recent pregnancy in the last two weeks, inherited metabolic disorders and mitochondrial disorders, heart disease, lung disease and certain neurological and neurologic and neurodevelopment conditions.[2] His age alone causes

---

[2] Centers for Disease Control and Prevention, Coronavirus Disease 2019: People Who Are at Higher Risk, https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-higher-risk.html.

Mr. Farchione to be at high risk for severe complications and death. ███████████████

████████████████████████████████ ████████████████████████

████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

████████████████████████████

There is no guarantee that Mr. Farchione at age 67 with his health problems would survive if

he contracts COVID-19. Even if he were to survive, he could suffer serious complications and

_____

[3] Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID 19)
https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html

[4] ████████████████████████████████████████
███████████████████████████████████

[5] ██████████████████████████████████
█████████████████████████████████████

possible damage such as heart inflammation, acute kidney disease, neurological malfunction, blood clots, intestinal damage and liver problems from this novel coronavirus.[7]

### III.

**Under the First Step Act, this Court has Broad Authority to Determine Whether Extraordinary and Compelling Circumstances Exist to Modify Mr. Farchione's Sentence**

The First Step Act ("FSA") expressly permits Mr. Farchione to move this Court to reduce his term of imprisonment and seek compassionate release. *See* 18 U.S.C. § 3583(c)(1)(A)(i). Under normal circumstances, a defendant can seek recourse through the courts after either (1) the BOP declines to file such a motion on his behalf; or (2) there has been of lapse of 30 days from the warden's receipt of the defendant's request, whichever is earlier. *Id.* On April 8, 2020 counsel to Mr. Farchione transmitted a request by email to the warden at Devens FMC. *See* April 8, 2020 request attached at Exhibit B. Although the BOP has yet to rule on the request (and thirty days have yet to pass), Mr. Farchione files this motion now in light of the urgent nature of this matter.

After exhausting or waiving the administrative process, "a court may then 'reduce the term of imprisonment' after finding that 'extraordinary and compelling reasons warrant such a reduction' and 'such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.'" *See United States v. Ebbers*, 2020 WL 91399, at *4, 02-CR-1144 (VEC) (ECF No. 384) (S.D.N.Y. Jan. 8, 2020). "In making its decision, a court must also consider 'the [sentencing] factors set forth in section 3553(a) to the extent that they are applicable.'" *Id.* (quoting 18 U.S.C. § 3582(c)(1)(A)).

---

[7] Lenny Bernstein, Carolyn Johnson, Sarah Kaplan, Laurie McGinley, Coronavirus damages kidneys and hearts as well as lungs, US doctors find, The Independent (April 16, 2020) at https://www.independent.co.uk/news/world/americas/coronavirus-symptoms-lung-kidney-heart-covid-19-us-doctors-a9466701.html

While courts have noted that the Sentencing Commission's applicable policy statement on what constitutes "extraordinary and compelling reasons" to warrant a sentence reduction is anachronistic because it has not been updated since passage of the FSA, they still continue to be guided by the Sentencing Commission's descriptions of "extraordinary and compelling reason." *See, e.g., Ebbers*, 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020). However, the Sentencing Commission's statements do not constrain the court's independent assessment of whether "extraordinary and compelling" reasons warrant a sentence reduction in light of the FSA's amendments. *United States v. Beck*, 2019 WL 2716505, at *5–6 (M.D.N.C. Tenn. Mar. 4, 2020) (collecting cases). The unprecedented nature of this emergency compels the Court to find the exhaustion requirement waived.  The Court need not and should not wait for Mr. Farchione to exhaust his administrative remedies under § 3582(c)(1)(A), as this would almost assuredly exacerbate an already impending public health catastrophe in our jails and prisons, while posing a danger to this individual. *See generally, Washington v. Barr*, 925 F.3d 109, 120–21 (2d Cir. 2019) ("[U]ndue delay, if it in fact results in catastrophic health consequences, could make exhaustion futile.").

A.          **The Court Should Waive Mr. Farchione's Failure to Exhaust**

This Court has the power to waive Mr. Farchione's failure to exhaust because the exhaustion of administrative remedies and the 30 day waiting period are not jurisdictional requirements and are subject to judicial waiver on equitable grounds. As Southern District of New York Judge Alison Nathan explained, "the First Step Act's text, history, and structure all counsel in favor of concluding that the statute's exhaustion requirement is amenable to equitable exceptions." *See United States v. Gerard Scparta,* No. 18 Cr. 578 (AJN) (S.D.N.Y. Apr. 19, 2020), ECF No. 69 (granting compassionate release due to COVID-19 prior to 30 days as the 30 day rule is a non-jurisdictional claim processing rule subject to equitable exceptions); *see also United States v. Russo*, No. 16-cr-441 (LJL), 2020 WL 1862294 (S.D.N.Y. Apr. 14, 2020). COVID-19 poses immediate dangers to Mr. Farchione's health

and therefore proceeding through the BOPs internal administrative process would be both futile and may result in irreparable harm.

The FSA's exhaustion requirement is a "claim processing rule" and is not jurisdictional. *Scparta*, No. 18 Cr. 578, ECF. No. 69 at 8, *United States v. Gross*, No. 15-cr-769 (AJN), 2020 WL 1862251 (S.D.N.Y. Apr. 14, 2020), *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013), *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011). "[T]he exhaustion requirement in Section 3582(c)(1)(A) merely controls who—the BOP or defendant— may move for compassionate release and when such a motion may be made. It simply delineates the process for a party to obtain judicial review, not referring the adjudicatory capacity of the courts." *Scparta*, No. 18 Cr. 578, ECF. No. 69 at 8 quoting *United States v. Haney*, No. 19-cr-541 (JSR), 2020 WL 1821988, at *2 (S.D.N.Y. Apr. 13, 2020).

As the government concedes, this statutory requirement is subject to waiver. *See, e.g.*, *United States v. Knox*, No. 15-cr- 445-12 (PAE) (government waived exhaustion requirement in a compassionate- release motion). The Supreme Court has held that analogous mandatory statutory rules are subject to equitable exceptions. *See Holland v. Florida* 560 U.S. at 645–46 (2010) ("a non-jurisdictional federal statute of limitations is normally subject to a 'rebuttable presumption' in *favor* 'of equitable tolling.'"), *see also Young v. United States*, 535 U.S. 43, 49 (2002) ("It is hornbook law that limitations periods are 'customarily subject to "equitable tolling"' (quoting *Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 95 (1990))).

As Judge Nathan explained, the Second Circuit has ruled that claim-processing rules are "subject to equitable considerations such as waiver estoppel or futility:"

> Judge Liman's recent decision is that the Second Circuit has provided more clear guidance, stating that "claim-processing rule[s]" are "subject to equitable considerations such as waiver, estoppel or futility." *Paese v. Hartford*

*Life & Acc. Ins. Co.*, 449 F.3d 435, 443 (2d Cir. 2006). In particular, the Second Circuit has applied this principle to statutes of limitation and deadlines contained in the Federal Rules, holding that exceptions exist to facially unequivocal time cutoffs. *See, e.g.*, *Weitzner v. Cynosure, Inc.*, 802 F.3d 307, 311 (2d Cir. 2015), as corrected (Oct. 27, 2015) (determining that the "28-day time limit of FRAP Rule 4(a)(4)(A)(vi) . . . should be considered a 'claim-processing rule,' which *is* subject to equitable exception or waiver"); *Grewal v. Cuneo Gilbert & LaDuca LLP*, 2020 WL 897410 (2d Cir. Feb. 25, 2020) ("We have held that Rule 4(a)'s 28-day deadline is not jurisdictional, but is a 'claim- processing rule' and, as such, its enforcement is subject to waiver, forfeiture, and other equitable exceptions."); *see also Fed. Ins. Co. v. United States*, 882 F.3d 348, 361 (2d Cir. 2018) ("Claim- processing rules, much like statutes of limitations, . . . may be subject to equitable tolling doctrines."). These cases, which the Court did not consider in its prior decision, counsel in favor of holding the First Step Act's exhaustion requirement amenable to judicial exception.

*Scparta*, No. 18 Cr. 578, ECF. No. 69 at 10.

Congress's clear intent was for the FSA's exhaustion requirement to permit exceptions. The Section 3582 exhaustion requirement is, "on its face" "extremely unusual…if not unprecedented." *Id.* at 12 quoting *Russo*, 2020 WL 1862294, at *6. Unlike other exhaustion requirements, Section 3582 requires that the defendant exhaust administration remedies *or* wait 30 days after serving his petition on the warden before filing a motion in court. *Id.* at 11 citing *Haney*, 2020 WL 1821988, at *3. The Supreme Court and Second Circuit have applied equitable exceptions to time requirements, "strongly supporting the conclusion that they apply here too." *Id.* at 10 citing *Holland*, 560 U.S. at 649 (applying equitable exception even though text did not permit such an exception); *Paese*, 449 F.3d at 443.

The Supreme Court looks to the titles of statutory provisions to determine congressional intent. *Scparta*, No. 18 Cr. 578, ECF. No. 69 at 12-13 citing *Yates v. United States*, 574 U.S. 528, 540 (2015); *Almendarez–Torres v. United States*, 523 U.S. 224, 234 (1998). The title of the FSA's provision that the exhaustion regime is "Increasing the Use and Transparency of Compassionate Release." Pub. L. No. 115-391, 132 Stat. 5339 (2018). Without equitable exceptions, inmates may never obtain

timely review of COVID-19 motions. *Scparta*, No. 18 Cr. 578, ECF. No. 69 at 14. Thus, the aims asserted in the title of the statute are not served by construing the exhaustion requirement strictly. *Id.*

The FSA's legislative history also evinces congressional intent favoring equitable exception. As Judge Nathan explained, denial of equitable exception is the precise "opposite result" of the statute's design to "enhance public safety" and "make[] . . . changes to Bureau of Prisons' policies and procedures to ensure prisoner and guard safety and security." *See id.* citing H.R. Rep. 115-699 at 22. The inability to social distance in BOP facilities and resultant rapid spread of COVID-19 places inmates, guards and the general public at greater risk. Because "the 30-day rule was meant as an accelerant to judicial review . . . it would pervert congressional intent to treat it as a substantial obstacle to effective judicial review." *Id.* at 15 quoting *Russo*, No. 16-cr-441 (LJL), Dkt. No. 54, at 5.

The policies underlying the exhaustion requirement would not be furthered by strict adherence in this instance. Giving the BOP time to decide administrative applications for compassionate release predicated on COVID-19 concerns would not "afford the parties and the courts the benefit of [the BOP's] experience and expertise." *Salfi*, 422 U.S. at 765. The BOP already has provided its "expert" input on such requests: its "COVID-19 Action Plan" lacks any consideration whatsoever of compassionate release. See Federal Bureau of Prisons COVID-19 Action Plan, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp. Counsel is unaware of any responses to compassionate release requests served on the warden at FMC Devens. Thus, it would be futile to force defendants to exhaust their administrative remedies—at the cost of their health and, potentially, their lives.

As discussed below, it is only a matter of time before COVID-19 spreads like wildfire in the prisons. As one Court held on March 19:

> The Court is glad to hear that there are currently no reported cases of
> COVID- 19 at Maguire, but is unsure what that means if people are not
> being tested. And, as the [prison's] management plan itself acknowledges,

> symptoms of COVID-19 can begin to appear 2-14 days after exposure, so
> screening people based on observable symptoms is just a game of catch up.
> That's why the Bay Area is on lockdown. We don't know who's infected.
> Accordingly, the government's suggestion that Toledo should wait until there
> is a confirmed outbreak of COVID-19 in Maguire before seeking release, see
> ECF No. 113 at 6 ("If the situation with respect to COVID-19 at Maguire
> changes, Toledo is free to seek reconsideration of the issue at that point."), is
> impractical. By then it may be too late.

*In the Matter of the Extradition of Alejandro Toledo Manrique*, 2020 WL 1307109, at *1, 19- MJ-71055
(MAG) (TSH) (N.D. Cal., Mar. 19, 2020).

On April 1, 2020, Honorable Analisa Torres granted a motion for compassionate release

to a defendant incarcerated at the MDC, waiving the exhaustion requirement.  In so doing, Judge

Torres stated:

> "[h]ere even a few weeks' delay carries the risk of catastrophic health
> consequences for [the defendant].  The Court concludes that requiring him
> to exhaust administrative remedies, given his unique circumstances and the
> exigency of a rapidly advancing pandemic, would result in undue prejudice
> and render exhaustion of the full BOP administrative process both futile and
> inadequate."

*United States v. Wilson Perez*, 17-Cr-513 (AT) (Dkt. No. 98, April 1, 2020).

In *Perez*, Judge Torres held that the exhaustion requirement should be waived because (1) the

requirement was futile; (2) the administrative process would be incapable of granting adequate relief;

and (3) exhaustion would subject the defendant to undue prejudice.  *Id.* at 4 (citing *Washington*, 925

F.3d at 118-19). Because of the defendant's "heightened risk of serious illness or death from

COVID-19 due to his pre-existing medical issues," strict adherence to the exhaustion requirement

"would be directly contrary to the purpose of identifying and releasing individuals whose

circumstances are extraordinary and compelling."  *Id.* at 6 (internal quotation marks omitted).

Other federal courts have likewise determined that they can hear compassionate release

petitions prior to the expiration of thirty days (or the exhaustion of administrative remedies). *United

States v. Huneeus*, No. 19 Cr. 10117 (IT) (D. Mass. Mar. 17, 2020), ECF No. 642 (granting defendant's

emergency motion based on COVID-19); *United States v. Arberry*, No. 15 Cr. 594 (JPO) (S.D.N.Y.

10

Nov. 12, 2019), ECF No. 84 (hearing and granting emergency compassionate release application of prisoner with cancer); *United States v. Haney*, No. 19 Cr. 541 (JSR), 2020 WL 1821988, at *2 (S.D.N.Y. Apr. 13, 2020); *United States v. Livingston*, No. 18 Cr. 416 (ENV), 2020 WL 1905202, at *1 (E.D.N.Y. Apr. 17, 2020) ("In the context of such extraordinary life-threatening circumstances, the crafting of judge-made exceptions to a statutory exhaustion requirement is not only appropriate, but compelled by the higher authority and God-made injunction to act, as the statute would otherwise permit, to save human life.").

Accordingly, requiring Mr. Farchione to exhaust his administrative remedies would be futile. Given the rapid spread of COVID-19 within the BOP system there is a high likelihood that he may contract this deadly virus if adjudication of this motion is delayed and he is not granted release.

## B.   "Extraordinary and compelling reasons" Warrant a Reduction in Mr. Farchione's Sentence

On March 11, 2020, the World Health Organization ("WHO") officially classified the new strain of coronavirus, COVID-19, as a pandemic.[8] COVID-19 is sweeping through jails and prisons across the country at a terrifying rate. On March 20, 2020, the New York City Department of Correction announced that one inmate and seven staff members in the city jails had been diagnosed with coronavirus.[9] One day later, on March 21, 2020, it became clear that no fewer than 38 people have tested positive.[10] At least 58 additional people are being held in contagious disease and quarantine units in the city's jail system.[11] But the cases are not abating. The chairwoman of the New

---

[8] "WHO Characterizes COVID-19 as a Pandemic," World Health Organization (March 11, 2020), available at https://bit.ly/2W8dwpS.

[9] *38 positive for coronavirus in NYC jails, including Rikers*, ABC News (Mar. 21, 2020), at https://abcnews.go.com/US/wireStory/38-positive-coronavirus-nyc-jails-including-rikers-69731911.

[10] *Id.*

[11] *Id.*

York City Board of Correction urged, "The best path forward to protecting the community of people housed and working in the jails is to rapidly decrease the number of people housed and working in them."[12]

Internationally, prisons have proven ripe for the rapid spread of COVID-19. In China, officials confirmed 500 cases of coronavirus in prisons.[13] Courts across Iran have granted 54,000 inmates furlough as part of the measures to contain coronavirus across the country.[14] Secretary of State Mike Pompeo has called for Iran to release Americans detained there because of the "deeply troubling" "[r]eports that COVID-19 has spread to Iranian prisons," noting that "[t]heir detention amid increasingly deteriorating conditions defies basic human decency."[15]

Currently, in the BOP system the number of COVID-19 cases is growing rapidly. The data shows that after six days of apparent deceleration in the number of new infections among staff and inmates, April 21, 2020 was the largest increase in current inmate infections, rising from 497 to 540.[16] Alarmingly, 24 people incarcerated in the BOP system have died.

---

[12] *Id.*

[13] Rhea Mahbubani, *Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials*, Business Insider (Feb. 21, 2020), at https://bit.ly/2vSzSRT.

[14] Claudia Lauer and Colleen Long, *US Prisons, Jails On Alert for Spread of Coronavirus*, The Associated Press (Mar. 7, 2020), at https://apnews.com/af98b0a38aaabedbcb059092db356697.

[15] Jennifer Hansler and Kylie Atwood, *Pompeo calls for humanitarian release of wrongfully detained Americans in Iran amid coronavirus outbreak*, CNN (Mar. 10, 2020), at   https://cnn.it/2W4OpV7.

[16] *See* https://www.bop.gov/coronavirus/,  https://www.levittandkaizer.com/



These numbers credit the BOP's information as accurate when it is known that there is a lack of testing of inmates. *See, e.g.*, *In the Matter of the Extradition of Manrique*, 2020 WL 1307109, at *1 (N.D. Cal. Mar. 19, 2020) (expressing concern about the infection rate within BOP facilities given that "people are not being tested"). In certain BOP facilities testing has stopped entirely.[17] It is concerning yet unsurprising that the low testing rates nonetheless reflect that COVID-19 cases are growing at a rapid pace in the BOP system.

"Prisons are petri dishes for contagious respiratory illnesses."[18] In just twelve days, the number of cases at Rikers Island went from one to nearly 200, prompting the top physician for the

---

[17] Jane Wester, *Federal Wardens' Report Shows No New Testing in NYC Prisons*, New York Law Journal, April 14, 2020 at https://www.law.com/newyorklawjournal/2020/04/14/federal-wardens-report-shows-no-new-testing-in-nyc-prisons/

[18] *Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons*, Los Angeles Times (Mar. 20, 2020), at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-

facility to call it "a public health disaster unfolding before our eyes."[19]  Other jails have also had positive tests for COVID-19, prompting officials to release substantial numbers of inmates to reduce overcrowding and slow the spread of the virus.[20]

The BOP has implemented measures to stop the spread but these are insufficient as inmates cannot socially distance and guards and other workers bring COVID-19 into facilities. On March 13, 2020, nearly two weeks after the first confirmed case of coronavirus in New York State, the BOP announced a 30-day suspension of all visits to all federal correctional facilities; however "there is no way to stop the daily flow of guards, teachers, food service and healthcare workers. Someone is certain to bring the virus in and take it back out while they are asymptomatic."[21] The BOP is now on a nationwide lockdown until May 18 but this too is insufficient to stop the spread as employees come and go and inmates are still unable to effectively socially distance.

To prevent new infections, the CDC strongly recommends the following actions: thorough and frequent handwashing, cleaning surfaces with Environmental Protection Agency approved disinfectants, keeping at least 6 feet of space between people, and social distancing. *See* Exhibit C Affidavit of Dr. Brie Williams. Dr. Williams is a professor of Medicine at University of California San Francisco. *Id.* ¶ 2. She is the Director of the university's program "Amend: Changing

---

warning-on-coronavirus-and-incarceration. *See also* Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, at https://doi.org/10.1086/521910.

[19] Miranda Bryant, *Coronavirus spread at Rikers is a 'public health disaster,' says jail's top doctor*, The Guardian, Apr. 1, 2020, https://www.theguardian.com/us-news/2020/apr/01/rikers-island-jail-coronavirus-public-health-disaster.

[20] Sydney Periera, *Confirmed Coronavirus Cases Rise in New York Jails, Increasing Pressure to Release People in Custody*, *available at* https://gothamist.com/news/confirmed-coronavirus-cases-rise-nyc-jails-increasing-pressure-release-people-custody.

[21] *Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons*, Los Angeles Times (Mar. 20, 2020), at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration.

Correctional Culture Program" and the Director of the "Criminal Justice & Health Program." *Id.* Dr. Williams sets forth specific concerns and risks associated with people spreading the COVID-19 at jails and the difficulties of stopping the spread in these facilities. *Id.*

Given what we know about COVID-19, the BOP's quest to contain the infection seems futile. Coronavirus is highly contagious. On average, one person with the coronavirus will infect between two to three other individuals.[22] But public health experts agree that incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[23] The majority of the people detained are housed in small two-man cells with a shared toilet and sink and eat meals and have recreation in groups of 70 or more. Inmates are not generally provided with sufficient masks, gloves, soap or space to social distance from other inmates or keep personal areas clean. As the data shows, once COVID-19 enters a BOP facility sickness and death ensue.[24]

Numerous courts around the country, including in this District, have already found that defendants' high risk of infection from COVID-19 – and the likelihood that such infection will be severe – as constituting (or, at a minimum contributing to) "extraordinary and compelling reasons" under U.S.S.G. § 1B1.13's catchall provision and have granted compassionate release. *See Scparta*, No. 18 Cr. 578 (AJN) (S.D.N.Y. Apr. 19, 2020) (granting compassionate release); *United States v.*

---

[22] *The average coronavirus patient infects at least 2 others, suggesting the virus is far more contagious than flu*, Business Insider (Mar. 17, 2020), at https://www.businessinsider.com/coronavirus-contagious-r-naught-average-patient-spread-2020-3.

[23] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (Mar. 2, 2020), at https://bit.ly/2W9V6oS.

[24] *See* https://www.bop.gov/resources/press_releases.jsp

*Asher Kataev*, No. 16 Cr. 763 (LGS), ECF Dkt. No. 779 (S.D.N.Y. Apr. 15, 2020)

(granting compassionate release with government consent); *United States v. Phillip Smith*, No. 12 Cr.

133 (JFK), ECF Dkt. 197 (S.D.N.Y. Apr. 13, 2020) (finding court could waive exhaustion

requirement and granting compassionate release); *United States v. William Knox*, No. 15 Cr. 445

(PAE), ECF Dkt. No. 1088 (S.D.N.Y. Apr. 10, 2020) (granting release on consent); *United States v.

Leon Santiago*, No. 12 Cr. 732 (WHP), ECF Dkt. No. 235 (S.D.N.Y. Apr. 10, 2020)

(granting release on consent); *United States v. Kenneth Moore*, No. 14 Cr. 476 (PGG) (granting release

on consent); *United States v. Nehemiah McBride*, No. 15 Cr. 876 (DLC), ECF Dkt. No. 73, (S.D.N.Y.

Apr. 7, 2020) (granting unopposed motion); *United States v. Tia Jasper*, No. 18 Cr. 390 (PAE), ECF

Dkt. No. 441 (S.D.N.Y. Apr. 6, 2020) (granting unopposed motion); *United States v. Clark Harris*, No.

18 Cr. 364 (PGG), ECF Dkt. 413 (S.D.N.Y. Apr. 6, 2020) (granting unopposed motion); *United

States v. Nunzio Gentille*, No. 19 Cr. 590 (KPF) (S.D.N.Y. Apr. 9, 2020) (granting release where

government agreed to waive exhaustion and did not oppose motion); *United States v. Zukerman*, No.

16 Cr. 194 (AT), 2020 WL 1659880, at *1 (S.D.N.Y. Apr. 3, 2020) (waiving exhaustion requirement

over government objection and granting release); *United States v. Resnick*, No. 12 Cr. 152 (CM), ECF

Dkt. No. 461 (S.D.N.Y. Apr. 2, 2020) (granting release and finding exhaustion requirement met

because request submitted by hand 30 days ago); *United States v. Daniel Hernandez*, No. 18 Cr. 834

(PAE), ECF Docket No. 446 (S.D.N.Y. Apr. 1, 2020) (granting compassionate release after BOP

denied the request and converting remaining sentence to home confinement);  *Perez*, No. 17 Cr. 513

(AT), ECF Docket No. 98, (S.D.N.Y. Apr. 1, 2020) (granting release based on health issues and

finding court could waive exhaustion requirement; government did not object based on defendant's

medical conditions); *United States v. Eli Dana*, No. 14 Cr. 405 (JMF), ECF Docket No. 108 (S.D.N.Y.

Mar. 31, 2020) (granting compassionate release motion without exhaustion of administrative

remedies, where government consented); *United States v. Damian Campagna*, No. 16 Cr. 78 (LGS),

2020 WL 1489829, at *1 (S.D.N.Y. Mar. 27, 2020) (granting compassionate release to defendant convicted of firearms offenses based on defendant's health and threat he faced from COVID-19; government consented to reduction and agreed health issues and COVID-19 were basis for relief); *United States v. Sassine Razzouk*, No. 11 Cr. 430 (ARR), ECF Dkt. 136 (E.D.N.Y. Apr. 19, 2020) (granting compassionate release following limited remand from circuit and finding court could waive exhaustion); *United States v. Vincent Asaro*, No. 17 Cr. 127 (ARR), ECF Dkt. 176 (E.D.N.Y. Apr. 17, 2020) (granting compassionate release over government objection based in part on COVID-19 risk, and based on defendant's age and other medical issues); *United States v. Hansen*, No. 07 Cr. 520 (KAM), 2020 WL 1703672, at *7 (E.D.N.Y. Apr. 8, 2020) (granting release and finding exhaustion because renewed petition submitted over 30 days prior); *United States v. David Henao*, No. 10 Cr. 231 (ENV), ECF Dkt. 93 (E.D.N.Y. Apr. 10, 2020) (granting release where government did not assert exhaustion defense); *United States v. William Sawicz*, No. 08 Cr. 287 (ARR), ECF Dkt. 66 (E.D.N.Y. Apr. 10, 2020) (granting release over government objection, waived exhaustion); *United States v. Hassan Chunn*, No. 16 Cr. 388 (BMC), ECF Dkt. 32 (E.D.N.Y. Apr. 8, 2020) (granting unopposed motion); *United States v. Darnell Jackson*, No. 15 Cr. 135 (ENV), ECF Dkt. No. 208 (E.D.N.Y. Apr. 6, 2020) (granted with government consent); *United States v. Jose Maria Marin*, No. 15 Cr. 252 (PKC), ECF Docket No. 1325-1326 (E.D.N.Y. Mar. 30, 2020) (waiving exhaustion requirement and granting compassionate release to defendant based on special risks he faced from COVID-19); *United States v. Gileno*, No. 19 Cr. 161 (VAB), 2020 WL 1916773, at *5 (D. Conn. Apr. 20, 2020) (finding that court can waive exhaustion requirement and granting compassionate release; government did not object); *United States v. Almonte*, No. 05 Cr. 58 (SRU), 2020 WL 1812713 (D. Conn. Apr. 9, 2020) (granting release); *United States v. Latrice Colvin*, No. 19 Cr. 179 (JBA), ECF Dkt. 38 (D. Conn. Apr. 2, 2020) (granting compassionate release and waiving exhaustion); *United States v. Jespen*, No. 19 Civ. 73 (VLB), 2020 WL 1640232, at *3 (D. Conn. Apr. 1, 2020) (finding exhaustion

requirement met where defendant was designated to non-BOP facility so BOP would not consider his application and granting release). Mr. Farchione is at even greater risk due to his advanced age and poor health requiring designation to a Federal Medical Center. The aforementioned decisions recognize that home confinement is "significantly better" than custody "where despite the BOP's best efforts, [an inmate] is constantly at risk from contamination both from within and without the prison walls, and where access to [personal protective equipment] for inmates is essentially non-existent." *Resnick*, at 14.

**C.      Mr. Farchione Has a Viable Release Plan and Should Be Granted Release**

Mr. Farchione is 67 years old with multiple serious health conditions making him particularly susceptible to severe complications and death from COVID-19. He has maintained a perfect track record while incarcerated and while on pre-trial release. On the consent of the government, he remained out on bond from May 15, 2017 until his surrender date of April 22, 2019 throughout the pendency of his criminal case without incident. He is not a flight risk or a danger to the community.

Importantly, Mr. Farchione is camp-eligible and will be transferred imminently to the low-security camp at Devens. Another BOP prison camp in Otisville has granted the majority of inmates furlough or home confinement due to COVID-19.[25]  One of those likely to be released is attorney Michael Cohen who is serving a three year sentence for his convictions of five counts of tax evasion, one count of making false statements to a financial institution, one count of willfully causing an unlawful corporate contribution, and one count of making an excessive campaign contribution at the request of a candidate for the principal purpose of influencing [the] election.[26] Dean G. Skelos,

---

[25] Benjamin Weiser and William K. Rashbaum, *Michael Cohen Is Among Prisoners to Be Released Because of Virus,* NY Times (April 17, 2020) at https://www.nytimes.com/2020/04/17/nyregion/michael-cohen-release-prison-otisville-virus.html

[26] "The eight-count criminal information, which alleged that COHEN concealed more than $4 million in personal income from the IRS, made false statements to a federally-insured financial

the former Republican State Senate majority leader who has been serving a four-year sentence in a corruption case, may also be approved for release. *Id.*

Mr. Farchione is similarly situated insofar as he is convicted of non-violent financial crimes and is approved for confinement at a BOP camp. Though he received a higher sentence than both Cohen and Skelos, with an 85% good time reduction he has served nearly 17% of his sentence and with up to a year in home confinement the percentage he has served is 20%. If granted compassionate release Mr. Farchione will still be imprisoned in his home for the remaining five years on his 84 month sentence. Thus, his punishment would continue.

Mr. Farchione's release plan includes residing with his wife in their two-bedroom home in Wells, Maine. He will be able to safely quarantine for 14 days and would remain on home confinement thereafter. His risk of contracting COVID-19 while on home confinement in Maine is minimal and far less than if he remains at Devens. Considering the likelihood that Mr. Farchione will be exposed to COVID-19 in the BOP system and the significant risk of dire outcomes due to his age and poor health this Court should grant his request for compassionate release.

### Conclusion

For the foregoing reasons, we respectfully request this Court modify Mr. Farchione's sentence to replace his outstanding term of imprisonment with an equal period of home incarceration by Ordering that his term of incarceration conclude forthwith and amend his conditions of release to add the condition of home incarceration for what would have been the remainder of his term. In the alternative, a 180 day furlough is requested.

---

institution in connection with a $500,000 home equity loan, and, in 2016, caused $280,000 in payments to be made to silence two women who otherwise planned to speak publicly about their alleged affairs with a presidential candidate, thereby intending to influence the 2016 presidential election." https://www.justice.gov/usao-sdny/pr/michael-cohen-pleads-guilty-manhattan-federal-court-eight-counts-including-criminal-tax

Dated:       New York, New York
                April 22, 2020

                                        Respectfully submitted,

                                        /s/

                                        _____

                                        Elizabeth Macedonio
                                        Carla Sanderson