

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 30, 2020

**VIA ECF**

The Honorable J. Paul Oetken
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

    Re: *United States* v. *John Farchione*, 17 Cr. 628 (JPO)

Dear Judge Oetken:

    The Government respectfully submits this letter in opposition to defendant John Farchione's motion for compassionate release pursuant to 18 U.S.C. § 3582(c) (Dkt. 66) ("Mot."). As set forth below, Farchione has failed to exhaust his administrative remedies, and, accordingly, the Court is without authority to order his release. Even if the Court has such authority, however, Farchione has not, and cannot, meet his burden of establishing that "extraordinary and compelling circumstances" warrant the approximately 85% reduction of his sentence he requests.

    **I.**    **Background**

    On May 5, 2017, the defendant was charged by complaint (the "Complaint") and arrested on charges of (i) honest services mail fraud, in violation of Title 18, United States Code, Sections 1341 and 1346; mail fraud, in violation of Title 18, United States Code, Section 1341; conspiracy to commit honest services fraud and mail fraud, in violation of Title 18, United States Code, Section 1349; and aggravated identity theft, in violation of Title 18, United States Code, Sections 1028A(a)(1) and 1028A(b). On October 11, 2017, a grand jury sitting in this District returned Indictment 17 Cr. 628 (the "Indictment"), charging Farchione with each of the offenses included in the Complaint. The charges stemmed from Farchione's creation and management of a calculated, sophisticated, and predatory fraud scheme against his employer, Consolidated Edison, Inc. ("Con Ed") and its customers, over the course of more than a decade, resulting in the theft of more than $6.5 million.

    In brief, Farchione exploited his job as the manager of the Con Ed department that was responsible for, among other things, reconciling payment checks to Con Ed that have bounced. Based on his thorough understanding of Con Ed's billing and payment processes, Farchione devised and implemented a fraudulent scheme, aided by a co-conspirator ("CC-1") who operated a business that aggregated payments from Con Ed customers for the purpose of transmitting such payments to Con Ed. At the suggestion of Farchione, CC-1 stopped using the cash given to him by Con Ed customers to pay Con Ed, and instead gave most of the cash to Farchione while also

keeping kickback portions for himself. To conceal this theft, CC-1, again at the defendant's suggestion, would then submit checks to Con Ed that both he and Farchione knew would bounce. After Con Ed received those insufficient checks, Farchione would manipulate Con Ed's systems to hide the fact that Con Ed had not actually received the customer payments—which were pocketed by Farchione and CC-1. This scheme went one for more than a decade, resulting in the defendant receiving millions of dollars in ill-gotten gains.

On August 6, 2018, following the empanelment of a jury and the attachment of double jeopardy, and with multiple Government trial witnesses present, the defendant pled guilty to each count in the Indictment: Count One, honest services mail fraud, in violation of Title 18, United States Code, Sections 1341 and 1346; Count Two, mail fraud, in violation of Title 18, United States Code, Section 1341; Count Three, conspiracy to commit honest services fraud and mail fraud, in violation of Title 18, United States Code, Section 1349; and Count Four, aggravated identity theft, in violation of Title 18, United States Code, Sections 1028A(a)(1) and 1028A(b).

On February 15, 2019, this Court sentenced Farchione to 60 months on Counts One through Three, concurrently, followed by a mandatory consecutive 24 months on Count Four, for a total of 84 months' incarceration. This sentence was significantly below the advisory sentencing guidelines range, including mandatory consecutive 24 months, of 159 to 192 months. In imposing this sentence, the Court primarily cited the breadth of the scheme, its temporal scope, and the significant loss amount, balanced against the defendant's personal circumstances and his lack of prior criminal history.

At sentencing, Farchione requested designation to a medical facility, and he currently is serving his sentence at Federal Medical Center ("FMC") Devens, in Massachusetts, having self-surrendered on or about April 22, 2019. As further discussed below, Farchione currently is pending transfer from the FMC Devens medical facility to the adjacent open compound minimum security satellite camp, general population. He does not currently have any acute medical conditions requiring residency in a medical facility, and rather is stable with some chronic conditions that can be managed through routine monitoring and occasional consultations with specialists, if necessary. Farchione recently completed the first year of his sentence and is scheduled to be released on April 6, 2025.

  **II.** **Farchione's Motion Must be Denied for Failure to Exhaust His Administrative Remedies**

In his submission, Farchione concedes that he has failed to exhaust his administrative remedies.[1] Because such exhaustion is mandatory, the court lacks the authority to grant compassionate release at this time.

---

[1] As of the time of this filing, the Government is not aware of whether the Bureau of Prisons has initially denied the request made by Farchione's counsel on or about April 8, 2020. *See* Mot. Ex. B. Even were Farchione's initial request denied, however, Section 3582(c) requires that, before filing a compassionate release motion in court, the defendant "fully exhausted all administrative rights *to appeal* a failure of the Bureau of Prisons to bring a motion on the

Under 18 U.S.C. § 3582(c), a district court "may not" modify a term of imprisonment once imposed, except under limited circumstances. One such circumstance is the so-called compassionate release provision, which provides that a district court "may reduce the term of imprisonment" where it finds "extraordinary and compelling circumstances." *Id.* § 3582(c)(1)(A)(i). A motion under this provision may be made by either the Bureau of Prisons ("BOP") or a defendant, but in the latter case only "after the defendant has *fully exhausted all administrative rights* to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.* (emphasis added). Thus, where a compassionate release motion is brought by a defendant who has not "fully exhausted all administrative rights," the district court "may not" modify his term of imprisonment.

Section 3582(c)(1)(A)'s exhaustion requirement is therefore mandatory. It is critical, in this context, to note that Section 3582(c)'s exhaustion requirement is statutory, and thus is not the sort of judicially-crafted exhaustion requirement that "remain[s] amenable to judge-made exceptions." *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016). By significant contrast, *statutory* exhaustion requirements "stand[] on a different footing." *Id.* There, "Congress sets the rules—and courts have a role in creating exceptions only if Congress wants them to." *Id.* Thus, where a statute contains mandatory exhaustion language, the only permissible exceptions are those contained in the statute. *Id.*; *see also Bastek v. Fed. Crop. Ins.*, 145 F.3d 90, 94 (2d Cir. 1998) ("Faced with unambiguous statutory language requiring exhaustion of administrative remedies, we are not free to rewrite the statutory text.").

As described above, Section 3582(c)(1)(A) contains mandatory exhaustion language with no statutory exceptions. The plain language of the statute makes clear that a court "may not" modify a sentence unless, as relevant here, the defendant has first "fully exhausted all administrative rights" or waited 30 days after transmitting his request to the warden. Unlike the Prison Litigation Reform Act ("PLRA"), for example, there is no statutory qualifier that a defendant need only exhaust all "available" remedies.[2] *See also* 28 U.S.C. § 2254(b)(1)(A) (habeas statute requires exhaustion of all remedies "available in the courts of the State"). Thus, Section 3582(c)(1)(A) is a mandatory exhaustion provision with no applicable exceptions. *Cf. Fry v. Napoleon Community Schools*, 137 S. Ct. 743, 750 (2017) (statute requiring that certain types of claims "shall be exhausted" is a mandatory exhaustion provision for those types of claims). As

---

defendant's behalf." Consistent with the statute, an inmate may appeal the warden's initial denial, and his petition is not fully exhausted until such appeals have been adjudicated (unless the 30-day waiting period has expired). 28 C.F.R. § 571.63(b)-(c); *see also United States v. Bolino*, No. 06 Cr. 806 (BMC), 2020 WL 32461, at *1 (E.D.N.Y. Jan. 2, 2020); *United States v. Johnson*, No. 00 Cr. 40023, 2020 WL 1434367, at *2 (W.D. Ark. Mar. 24, 2020).

[2] In particular, the PLRA demands that an inmate exhaust "such administrative remedies *as are available*," meaning that the only permissible exception to exhaustion is where the remedies are "unavailable." *Ross,* 136 S. Ct. at 1856-58 (emphasis added); *see also id.* at 1855 (criticizing the "freewheeling approach" adopted by some courts of appeals to exhaustion requirements, and overruling precedent from the Second Circuit and other circuits that had read additional exceptions into the rule). Here, no such exception exists in the statute.

Circuit Judge Sullivan, sitting by designation, recently explained, Section 3582(c)'s exhaustion requirement is "clear as day" and is therefore mandatory. *United States v. Ogarro*, No. 18 Cr. 373 (RJS), 2020 WL 1876300, at *3 (S.D.N.Y. Apr. 14, 2020).

In recent weeks, numerous defendants around the country have cited the unusual circumstances presented by COVID-19 as a basis for compassionate release, and have argued that the exhaustion requirement should be excused. The only court of appeals to have addressed the question has rejected the argument and required exhaustion. *See United States v. Raia*, __ F.3d __, 2020 WL 1647922 (3d Cir. Apr. 2, 2020). In *Raia*, the Third Circuit recognized the serious concerns presented by COVID-19, but held that, in light of these concerns, as well as the BOP's statutory role and its "extensive and professional efforts to curtail the virus's spread, . . . strict compliance with Section 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Id.* at *2. The vast majority of district courts in this District have also required exhaustion despite COVID-19 claims.[3] These decisions are consistent with the plain language of Section 3582(c).

To be sure, COVID-19 presents unusual circumstances, in which compassionate release decisions should be made expeditiously. But the text of Section 3582 contains no exigency exception for such circumstances, and indeed the text affirmatively refutes the availability of such an exception. While many statutory exhaustion provisions require exhaustion of all administrative remedies before a claim is brought in court, Section 3582 provides an alternative: exhaustion of all administrative rights *or* the lapse of 30 days from the warden's receipt of the inmate's request

---

[3] *See United States v. Wright*, 17 Cr. 695 (CM), 2020 WL 1922371, at *2 (S.D.N.Y. Apr. 20, 2020); *United States v. Demaria*, No. 17 Cr. 569 (ER), 2020 WL 1888910, at *4 (S.D.N.Y. Apr. 16, 2020); *United States v. Ogarro*, No. 18 Cr. 373 (RJS), 2020 WL 1876300, at *3-*5 (S.D.N.Y. Apr. 14, 2020); *United States v. Bonventre*, 10 Cr. 228 (LTS), 2020 WL 1862638, at *2-*3 (S.D.N.Y. Apr. 14, 2020); *United States v. Pereyra-Polanco*, 19 Cr. 10 (NRB), 2020 WL 1862639, at *1 (S.D.N.Y. Apr. 14, 2020); *United States v. Rabadi*, No. 13 Cr. 353 (KMK), 2020 WL 1862640, at *2-*3 (S.D.N.Y. Apr. 14, 2020); *United States v. Reese*, No. 12 Cr. 629 (VM), 2020 WL 1847552, at *2 (S.D.N.Y. Apr. 13, 2020); *United States v. Engleson*, 13 Cr. 340 (RJS), 2020 WL 1821797, at *1 (S.D.N.Y. Apr. 10, 2020); *United States v. Fana*, 19 Cr. 11 (GHW), 2020 WL 1816193, at *5 (S.D.N.Y. Apr. 10, 2020); *United States v. Canale*, 17 Cr. 287 (JPO), 2020 WL 1809287, at *2 (S.D.N.Y. Apr. 9, 2020); *United States v. Roberts*, No. 18 Cr. 528 (JMF), 2020 WL 1700032, at *2 (S.D.N.Y. Apr. 8, 2020); *United States v. Ramos*, No. 14 Cr. 484 (LGS), 2020 WL 1685812, at *1 (S.D.N.Y. Apr. 7, 2020); *United States v. Crosby*, No. 09 Cr. 1056 (WHP) (S.D.N.Y. Apr. 7, 2020) (Tr. of 4/7 conference, at 13); *United States v. Woodson*, No. 18 Cr. 845 (PKC), 2020 WL 1673253, at *3 (S.D.N.Y. Apr. 6, 2020); *United States v. Arena*, No. 18 Cr. 14 (VM) (S.D.N.Y. Apr. 6, 2020) (Dkt. 354 at 2-3); *United States v. Hernandez*, No. 18 Cr. 834 (PAE), 2020 WL 1445851, at *1 (S.D.N.Y. Mar. 25, 2020); *United States v. Cohen*, No. 18 Cr. 602 (WHP), 2020 WL 1428778, at *1 (S.D.N.Y. Mar. 24, 2020). *But see United States v. Scparta*, No. 18 Cr. 578 (AJN), 2020 WL 1910481, at *5 (S.D.N.Y. Apr. 20, 2020); *United States v. Russo*, 16 Cr. 441 (LJL), 2020 WL 1862294, at *7 (S.D.N.Y. Apr. 14, 2020); *United States v. Haney*, No. 19 Cr. 541 (JSR), 2020 WL 18211988, at *4 (S.D.N.Y. Apr. 13, 2020); *United States v. Perez*, No. 17 Cr. 513 (AT), 2020 WL 1546422, at *3 (S.D.N.Y. Apr. 1, 2020).

for compassionate release, whichever is earlier. 18 U.S.C. § 3582(c)(1)(A). This 30-day alternative rule is a "limited futility-like exception," and, therefore, "[g]iven Congress's decision to mandate exhaustion and specify a single alternative, the Court is not free to infer a 'general unwritten special circumstances exception.'" *United States v. Roberts*, No. 18 Cr. 528 (JMF), 2020 WL 1700032, at *2 (S.D.N.Y. Apr. 8, 2020) (quoting *Ross*, 136 S. Ct. at 1856, 1862); *see also United States v. Arena*, No. 18 Cr. 14 (VM) (Dkt. 354 at 2) (S.D.N.Y. Apr. 6, 2020) (stating that there is "simply no authority that permits [the defendant] to circumvent the administrative exhaustion requirement" based on futility, because the ability to seek relief after 30 days constitutes "an express futility provision"). Ultimately, defendants' arguments regarding the need for a futility exception "boil[] down to a pragmatic insistence that a 30-day waiting period is simply too long to wait in the current health crisis. But there is nothing in the First Step Act or its history to suggest that courts may modulate the exhaustion waiting period when they see fit." *Ogarro*, 2020 WL 1876300, at *5.

As the Third Circuit properly recognized, the mandatory exhaustion requirement accommodates the valuable role that the BOP plays in the compassionate release process. Informed decisions about compassionate release require the collection of information, like disciplinary records and medical history, that the BOP is uniquely suited to obtain and which will benefit both the BOP and later the court evaluating such claims. The BOP is also well situated to make relative judgments about the merits of compassionate release petitions—particularly at a time like this when many inmates are making petitions advancing similar claims—and adjudicate those positions in a consistent manner. The Court may of course review those judgments, but the Congress expressed its clear intent that such review would come second, with the benefit of the BOP's initial assessment. *See United States v. Woodson*, No. 18 Cr. 845 (PKC), 2020 WL 1673253, at *3 (S.D.N.Y. Apr. 6, 2020).

To ignore this mandatory exhaustion requirement would be legal error.

*United States v. Haney*, 19 Cr. 541 (JSR), 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020), *see* Mot. at 7-8, 11, does not compel a different result. In *Haney*, Judge Rakoff held that, notwithstanding the plain language of Section 3582(c)(1)(A), "Congress cannot have intended the 30-day waiting period . . . to rigidly apply in the highly unusual situation in which the nation finds itself today." *Id.* at *3. Judge Rakoff reached this conclusion by construing the 30-day waiting period as indicative of Congressional intent to accelerate judicial review. *Id.* at *4. But as Judge Sullivan has explained, given that Congress expressly chose *30 days* as the period after which judicial review is available, courts are not free to make a different choice. *Ogarro*, 2020 WL 1876300, at *5; *see also Roberts*, 2020 WL 1700032, at *2 ("Given Congress's decision to mandate exhaustion and specify a single alternative, the Court is not free to infer a 'general unwritten special circumstances exception.'" (quoting *Ross*, 136 S. Ct. at 1856, 1862)). And despite the suggestion that Congress cannot have foreseen circumstances as exigent as the ones now facing the defendant, that simply is not so. Rather, in cases presenting the most urgent circumstance—inmates diagnosed with a terminal illness—Section 3582(d) requires the BOP to process any application for compassionate release in 14 days. That the Congress allowed 14 days to process the claims of even a terminally ill inmate suggests that it could not have intended to allow a shorter period—which excusing exhaustion would provide—in a case, such as this, where

the risk to the inmate, while serious, remains potential. It was error for Judge Rakoff to ignore this "glaring roadblock" to judicial review. *Raia*, 2020 WL 1647922, at *2.

Similarly, neither Judge Liman's decision in *United States v. Russo*, 16 Cr. 441 (LJL), 2020 WL 1862294, at *7 (S.D.N.Y. Apr. 14, 2020), nor Judge Nathan's decision in *United States v. Scparta*, 18 Cr. 578 (AJN), 2020 WL 1910481 (S.D.N.Y. Apr. 19, 2020), which cites *Russo* throughout, *see* Mot. at 6-9, compels a different result. In *Russo*, Judge Liman (correctly) held that Section 3582(c)'s exhaustion requirement is a claims-processing rule that is generally mandatory but may be waived by the Government. *Id.* at *4. But Judge Liman went on to hold that Section 3582(c)'s exhaustion requirement may be excused for equitable reasons. *Id.* at *5-6. However, courts are not free to create equitable exceptions to statutory commands if doing so "would be inconsistent with the text of the relevant statute." *Young v. United States*, 535 U.S. 43, 49 (2002); *see also Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001) ("[W]e will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise."). Here, the text of the relevant statute is inconsistent with Judge Liman's proposed exception for "extraordinary circumstances." As described above, Congress's choice of 30 days for judicial review does not leave judges free to select a different period. Thus, even assuming it were correct that equitable exceptions to statutory claims-processing rules are appropriate in *some* contexts, *see Hamer v. Neighborhood Hous. Servs.*, 138 S. Ct. 13, 18 n.3 (2017) (reserving on question), the proposed "extraordinary circumstances" exception is not permissible here. *See Ogarro*, 2020 WL 1876300, at *4 (rejecting application of equitable doctrines to this statute).

Judge Keenan's decision in *United States v. Smith*, 12 Cr. 133 (JFK), 2020 WL 1849748, at *3 (S.D.N.Y. Apr. 13, 2020), *see* Mot. at 16, does not compel a different result for two reasons. First, Judge Keenan found that the BOP's decision to grant the defendant's release to a halfway house was at least a "partial satisfaction of the exhaustion requirement." *Id.* at *3. That circumstance is not presented here. Second, Judge Keenan appeared to hold that *the court* had the power to waive exhaustion in light of the Government's position that *the Government* may waive exhaustion. *Id.* at *4. But that does not follow. The nature of a mandatory claims-processing rules are that they "assure relief to a party properly raising them, but do not compel the same result if the party forfeits them." *Eberhart v. United States*, 546 U.S. 12, 19 (2005); *see also Ogarro*, 2020 WL 1876300, at * 3 ("[A] timely asserted mandatory claim-processing rule must be strictly enforced by courts even though it is not a jurisdictional bar.").

*Washington v. Barr*, 925 F.3d 109 (2d Cir. 2019) is inapposite, and the cases relying upon it in this regard are in error, *see United States v. Perez,* 17 Cr. 513 (AT) 2020 WL 1546422, at *2 (S.D.N.Y. Apr. 1, 2020); *United States v. Zukerman*, 16 Cr. 194 (AT), 2020 WL 1659880, at *1 (S.D.N.Y. Apr. 3, 2020). *Washington* involved the invocation of a *judge-made* exhaustion doctrine. *See Washington* at 116 (stating that the statute in question "does not mandate exhaustion of administrative remedies" but finding that exhaustion requirement was nevertheless appropriate); *id.* at 118 ("Although not mandated by Congress, [exhaustion] is consistent with congressional intent."). Thus, it was appropriate for the court to consider judge-made exceptions. *See Ross*, 136 S. Ct. at 1857. But this case involves a mandatory, statutory exhaustion requirement, which allows for no such exceptions. *See Bastek*, 145 F.3d at 95 (rejecting application of various exceptions to exhaustion requirement where clear statutory requirement exists); *Theodoropoulos v. INS*, 358 F.3d 162, 172 (2d Cir. 2004) (rejecting futility exception to exhaustion requirement in Immigration

and Nationality Act because such an exception is "simply not available when the exhaustion requirement is statutory," as opposed to judicial); *United States v. Gonzalez-Roque*, 301 F.3d 39, 46-48 (2d Cir. 2002) (rejecting argument that statutory exhaustion requirement for collaterally attacking a removal order should be excused in light of defendant's *pro se* status).

To be sure, *Washington* states that: "Even where exhaustion is seemingly mandated *by statute or decisional law*, the requirement is not absolute. The Supreme Court itself has recognized exceptions to the exhaustion requirement under 'three broad sets of categories.'" *Washington*, 925 F.3d at 118 (emphasis added) (quoting *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992)). But the inclusion of the phrase "by statute" is not supported by the citation that follows. *McCarthy* is another case involving a judge-made exhaustion requirement. *See McCarthy*, 503 U.S. at 152 ("Congress has not *required* exhaustion of a federal prisoner's *Bivens* claim."). It thus provides no support for the notion that exhaustion mandated "by statute" is not absolute. *See Bastek*, 145 F.3d at 95 (rejecting application of *McCarthy* exceptions in a statutory case). Further, when *Washington* goes on to discuss three recognized exceptions to exhaustion, it is describing three exceptions recognized in *McCarthy* in the judge-made context. But as the Supreme Court made crystal clear in *Ross*, this ignores the critical distinction between statutory and judge-made exhaustion requirements. As Judge Sullivan has explained, given that *Washington* was a judge-made exhaustion case, its statement that exhaustion mandated "by statute" is "not absolute" is dicta. *See Ogarro*, 2020 WL 1876300, at *4; *see also Woodson*, 2020 WL 1673253, at *3 ("The passing reference to 'exhaustion [that] is seemingly mandated by statute . . . is not absolute' in [*Washington*] was not necessary to the Court of Appeals' holding."); *Roberts*, 2020 WL 1700032, at *2 (rejecting argument that *Washington* permits excusing exhaustion under Section 3582(c); unlike those that are judge-made, "statutory exhaustion requirements, such as those set forth in Section 3582(c), must be strictly enforced"). *Washington*'s dicta cannot supplant the clear statements to the contrary in cases like *Ross* and *Bastek*. Accordingly, Judge Torres erred by citing *Washington*'s discussion of judge-made exceptions to a judge-made exhaustion rule to justify excusing exhaustion under Section 3582(c). *See Perez*, 2020 WL 1546422, at *2 (relying on *Washington*); *Zukerman*, 2020 WL 1659880, at *1 (relying on *Washington*).

In sum, the analysis of a statutory exhaustion requirement must "begin[] with the text" and utilize "ordinary interpretive techniques." *Ross*, 136 S. Ct. at 1856 and 1858 n.2. As set forth above, the text of Section 3582(c) provides for no exceptions.[4]

---

[4] In the alternative, Farchione asks the Court to grant him a furlough pursuant to 18 U.S.C. § 3622. However, as is plain from the language of the statute, only the BOP has the authority to grant such a temporary release. *See* 18 U.S.C. § 3622 ("The *Bureau of Prisons* may release a prisoner from the place of his imprisonment for a limited period if such release appears to be consistent with the purpose for which the sentence was imposed and any pertinent policy statement issued by the Sentencing Commission [. . . .]." (emphasis added)). Farchione cites no authority to the contrary.

### III. Farchione Has Not Demonstrated That Extraordinary and Compelling Reasons Warrant a Reduction of His Sentence

Farchione's motion must be denied for failure to exhaust his administrative remedies. Accordingly, the Court need not and should not reach the merits of his motion. But if the Court were to reach the merits, it should likewise reject the motion. While COVID-19 is unquestionably serious, and the situation is dynamic, Farchione has not met his burden to demonstrate compelling and extraordinary circumstances warranting immediate release.

#### A. Applicable Law

Under Section 3582, the Court "may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).

The relevant Sentencing Commission policy statement is U.S.S.G. § 1B1.13. That statement provides that the Court may reduce the term of imprisonment if "extraordinary and compelling reasons warrant the reduction," *id.* § 1B1.13(1)(A); "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," *id.* § 1B1.13(2); and "the reduction is consistent with this policy statement," *id.* § 1B1.13(3). The Application Note describes the circumstances under which "extraordinary and compelling reasons exist":

(A) Medical Condition of the Defendant.—

    (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

    (ii) The defendant is—
        (I) suffering from a serious physical or medical condition,
        (II) suffering from a serious functional or cognitive impairment, or
        (III) experiencing deteriorating physical or mental health because of the ageing process,

    that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the ageing process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family circumstances.—

        (i)      The death or incapacitation of the caregiver of the defendant's minor child or minor children.

        (ii)     The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

    (D)   Other reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

*Id.* § 1B1.13 Application Note 1.

Regardless of the theory of "extraordinary and compelling reasons" under which a defendant proceeds, as noted above, the 18 U.S.C. § 3553(a) factors are relevant to whether release is warranted. *See* 18 U.S.C. § 3582; U.S.S.G. § 1B1.13.

As the proponent of release, the defendant bears the burden of proving that "extraordinary and compelling reasons" exist. " *United States v. Gotti*, No. 02 Cr. 743 (CM), 2020 WL 497987, at *5 (S.D.N.Y. Jan. 15, 2020); *United States v. Ebbers*, No. 02 Cr. 11443 (VEC), 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020); *see generally United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue.").

### B. The BOP and COVID-19

The BOP has made and continues to make significant efforts to respond to the threat posed by COVID-19.

Since at least October 2012, the BOP has had a Pandemic Influenza Plan in place. *See* BOP Health Management Resources, https://www.bop.gov/resources/health_care_mngmt.jsp. In January 2020, the BOP began to plan specifically for COVID-19 to ensure the health and safety of inmates and BOP personnel. *See* BOP COVID-19 Action Plan, https://www.bop.gov/resources/news/ 20200313_covid-19.jsp. As part of its Phase One response, the BOP began to study "where the infection was occurring and best practices to mitigate transmission." *Id.* In addition, the BOP stood up "an agency task force" to study and coordinate its response, including using "subject-matter experts both internal and external to the agency including guidance and directives from the [World Health Organization (WHO)], the [Centers for Disease Control and Prevention (CDC)], the Office of Personnel Management (OPM), the Department of Justice (DOJ) and the Office of the Vice President. BOP's planning is structured using the Incident Command System (ICS) framework." *Id.*

On or about March 13, 2020, the BOP implemented its Phase Two response "to mitigate the spread of COVID-19, acknowledging the United States will have more confirmed cases in the coming weeks and also noting that the population density of prisons creates a risk of infection and transmission for inmates and staff." *Id.* These national measures are intended to "ensure the continued effective operations of the federal prison system and to ensure that staff remain healthy and available for duty." *Id.* For example, the BOP (a) suspended social visits for 30 days (but increased inmates access to telephone calls); (b) suspended legal visits for 30 days (with case-by-case accommodations);

(c) suspended inmate movement for 30 days (with case-by-case exceptions, including for medical treatment); (d) suspended official staff travel for 30 days; (e) suspended staff training for 30 days; (f) restricted contractor access to BOP facilities to only those performing essential services, such as medical treatment; (g) suspended volunteer visits for 30 days; (h) suspended tours for 30 days; and (i) generally "implement[ed] nationwide modified operations to maximize social distancing and limit group gatherings in [its] facilities." *Id.* In addition, the BOP implemented screening protocols for both BOP staff and inmates, with staff being subject to "enhanced screening" and inmates being subject to screening managed by its infectious disease management programs. *Id.* As part of the BOP's inmate screening process, (i) "[a]ll newly-arriving BOP inmates are being screened for COVID-19 exposure risk factors and symptoms"; (ii) "[a]symptomatic inmates with exposure risk factors are quarantined; and (iii) "[s]ymptomatic inmates with exposure risk factors are isolated and tested for COVID-19 per local health authority protocols." *Id.*

On or about March 18, 2020, the BOP implemented Phase Three, which entailed: (a) implementing an action plan to maximize telework for employees and staff; (b) inventorying all cleaning, sanitation, and medical sup-plies; (c) making sure that ample supplies were on hand and ready to be distributed or moved to any facility as deemed necessary; and (d) placing additional orders for those supplies, in case of a protracted event. *See* BOP Update on COVID-19, *at* https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf.

On or about March 26, 2020, the BOP implemented Phase Four, which entailed: (a) updating its quarantine and isolation procedures to require all newly admitted inmates to BOP, whether in a sustained community transition area or not, be assessed using a screening tool and temperature check (including all new intakes, detainees, commitments, writ returns from judicial proceedings, and parole violators, regardless of their method of arrival); (b) placing asymptomatic inmates in quarantine for a minimum of 14 days or until cleared by medical staff; and (c) placing symptomatic inmates in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. *See* BOP COVID-19 Action Plan: Phase Five, https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp

On or about April 1, 2020, the BOP implemented Phase Five, which entails: (a) securing inmates in every institution to their assigned cells/quarters for a 14-day period to decrease the spread of the virus; (b) to the extent practicable, offering inmates access to programs and services that are offered under normal operating procedures, such as mental health treatment and education; (c) coordinating with the U.S. Marshals Service to significantly decrease incoming movement; (d) preparing to reevaluate after 14 days and make a decision as to whether or not to return to modified operations; and (e) affording limited group gathering to the extent practical to facilitate commissary, laundry, showers, telephone, and Trust Fund Limited Inmate Computer System access. *Id*.

The BOP has also "increased Home Confinement by over 40% since March and is continuing to aggressively screen all potential inmates for Home Confinement." Update on Home Confinement, https://www.bop.gov/resources/news/20200405_covid19_home_confinement.jsp. In addition, the BOP "has begun immediately reviewing all inmates who have COVID-19 risk factors, as described by the CDC, starting with the inmates incarcerated at FCI Oakdale, FCI Danbury, FCI Elkton and similarly-situated facilities [with COVID-19 outbreaks] to determine which inmates are suitable for home confinement." *Id*.

These and other steps belie any suggestion that the BOP is failing to address meaningfully the risk posed by COVID-19 to inmates. To the contrary, they show that the BOP has taken the threat seriously, has mitigated it, and continues to update policies and procedures in accord with the facts and recommendations. Indeed, the Government understands from counsel at FMC Devens, where Farchione is housed, that as of April 27, 2020, just a single prisoner assigned to that facility has tested positive for COVID-19, and that inmate is located in a secured unit, where other inmates do not have access, and is being closely monitored and isolated. No other inmates, and no guards, have tested positive at FMC Devens. There is therefore no reason to believe that Farchione has had any contact with individuals who have tested positive for COVID-19. Additionally, and as described above, FMC Devens is itself a federal medical facility, and is therefore particularly well equipped to address any inmate medical needs.

### C. Discussion

In his motion, Farchione argues that release is warranted because he would be particularly susceptible to severe complications and death were he to contract COVID-19. A reduced sentence is available only for defendants who present "extraordinary and compelling reasons" for a modified sentence *and* for whom a reduction accords with the policy statements set forth in the Guidelines. *See* U.S.S.G. § 1B1.13. Farchione does not satisfy either element. As to "extraordinary and compelling reasons," the U.S. Sentencing Guidelines contemplate such conditions could exist, as to a defendant's "medical condition" where the defendant is suffering from a "terminal illness" or the defendant is suffering from a serious physical or medical condition "that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 Note 1(A). Neither of these circumstances—both of which require the existence of a present serious medical condition from which there will be no recovery—are applicable.

Certainly Farchione has health conditions that require monitoring, including hypertension and other heart issues, as well as some indications of lung concerns. *See generally* Mot. at 3-4. However, not only are none of those issues terminal, nor do they substantially diminish his ability to provide self-care, according to counsel for FMC Devens, Farchione's health status has recently been *upgraded* (or "reduced") from Care Level 3 to Care Level 2, which include normal and stable health conditions associated with age, and within normal limits—and which allow Farchione to be transferred from the medical facility to the general population of the minimum security facility at FMC Devens. This transfer was pending as of approximately April 27, 2020, subject only to the completion of a precautionary quarantine period of two weeks, consistent with social-distancing and isolation precautions for transfer. *See also* Mot. at 3 ("Mr. Farchione has been approved to be transferred to the camp and upon information and belief his transfer is happening imminently."). Additionally, the BOP is the appropriate reviewing entity, particularly in the first instance, for these factors. Indeed, the evaluation of an application—and the reasons—for such extraordinary relief is commended to the discretion of the BOP, see U.S.S.G. § 1B1.13 app. note 1(A)–(D), which is best situated to evaluate these considerations.

In sum, Farchione has the kind of manageable and stable conditions commonly associated with someone of his age; he is well enough to be placed in general population of a minimum security facility but also has immediate access to an adjacent medical facility if he were to require medical intervention; and he has been prescribed, and has full access to, necessary medication to address his conditions.

Moreover, and in any event, the same Section 3553(a) factors that informed this Court's decision to impose a term of 84 months also counsel against his release now, when Farchione has served just one year of that sentence. By comparison, for example, the defendant cites the home confinement decisions relating to inmate Daniel Hernandez, *see* Mot. at 16, who is readily distinguishable from the defendant. Judge Engelmayer granted Mr. Hernandez's compassionate release motion after Mr. Hernandez had exhausted administrative remedies, served the substantial majority of his prison sentence, and publicly cooperated against members of a violent gant. *See United States v. Hernandez*, 18 Cr. 834 (PAE) (S.D.N.Y. April 1, 2020) (Dkt. 451) at 7. Additionally, despite the defendant's references to serving "the remainder of his sentence" on home confinement, Mot. at 2, 19, "the only way to grant [him] the relief [he] seeks (i.e., release from prison) under Section 3583(c) is to reduce [his] sentence to time served—in other words, to *permanently* release [him]." *Roberts*, 2020 WL 1700032, at *3 (emphasis in original); *see also United States v. Urso*, 03 Cr. 1382 (NGG), 2019 WL 5423431, at *1 (E.D.N.Y. Oct. 23, 2019); 18 U.S.C. 3621(b). Pursuant to 18 U.S.C. § 3624(c), the BOP has the sole authority to place a prisoner in home confinement, "for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months," neither of which is applicable here in any event. Of course, in theory the Court could grant the 85% reduction in sentence the defendant requests, and also order that he serve his term of *supervised release* at home, but that would be limited to the three years of supervised release imposed by the Court—less than half of Farchione's original sentence and barely half of his *remaining* term of incarceration.

Farchione seeks to be released to his home for the remaining term of imprisonment because of a pandemic that—while unquestionably serious—presents a hypothetical risk of infection, one which the BOP is taking substantial steps to address and one which, in all likelihood, will have abated will in advance of Farchione's projected release date. Such an outcome would result in an unprecedented windfall for a defendant who committed serious crimes, where there is a substantial public interest in ensuring that he is held fully accountable for his conduct. Such an outcome would not only be contrary to the relevant statute but contrary to the critical factors, including the serious nature of the scheme, the violation of trust involved in the offenses, and the need for general deterrence that led the Court to impose an 84-month sentence in the first place.

### IV.     Conclusion

For the foregoing reasons, Farchione's motion should be denied without prejudice because he has failed to comply with the statute's mandatory exhaustion requirements, and because even had he complied with those requirements, his circumstances do not meet the high bar required for immediate release in any event.

Very truly yours,

GEOFFREY S. BERMAN
United States Attorney

By: _____
Alex Rossmiller / Sidhardha Kamaraju
Assistant United States Attorneys
Southern District of New York
(212) 637-2415